UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ANANTHA K. SANKEY,

      Plaintiff,

                                        CASE NO. 23-cv-00944

v

WESTERN MICHIGAN UNIVERSITY,

                                        HON. _____

      Defendant.

Charissa C. Huang (P75501)
Kevin J. Cowan (P85674)
SMITH HAUGHEY RICE & ROEGGE
Attorneys for Plaintiff
100 Monroe Center, N.W.
Grand Rapids, MI 49503
616-774-8000
chuang@shrr.com
kcowan@shrr.com

**COMPLAINT AND JURY DEMAND**

There is no pending or resolved civil action arising
out of the same transaction or occurrence as alleged
in the Complaint.

NOW COMES plaintiff, Anantha K. Sankey, by and through his attorneys, Smith Haughey Rice & Roegge, and for his Complaint against defendant states as follows:

**<u>PARTIES, JURISDICTION, AND VENUE</u>**

1.     Plaintiff Anantha K. Sankey (hereinafter "Mr. Sankey") is an Asian Indian American male of Malaysian national origin, and a citizen of the United States and the State of Michigan.  Mr. Sankey is, and was at all relevant times to this action, an individual residing in City of Kalamazoo, Kalamazoo County, Michigan, which is within the territorial limits of the United

States District Court for the Western District of Michigan.

2.      Defendant Western Michigan University (hereinafter "WMU") is a public university conducting business in the City of Kalamazoo, County of Kalamazoo, in the State of Michigan, which is within the territorial limits of the United States District Court for the Western District of Michigan.

3.      Mr. Sankey is, and at all relevant times to the Complaint, was, an employee of WMU.

4.      This action arises pursuant to federal statutes 42 U.S.C. § 1981, 42 U.S.C.§ 1988, and Title VII of the Civil Rights Act of 1964. Thus, jurisdiction is specifically conferred on this Court by the aforementioned statutory provisions.

5.      The jurisdiction of the Court is further invoked pursuant to 28 U.S.C. §1343 and 28 U.S.C. §1367.

6.       The unlawful employment practices alleged below were committed within the Western District of the State of Michigan. Thus, venue is proper pursuant to 28 U.S.C. § 1391.

7.      Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) and received his Notice of Right to Sue regarding the aforementioned claims on June 8, 2023, and thus now files his claim pursuant to Title VII of the Civil Rights Act of 1964, having satisfied his pre-filing requirements.

8.      The amount in controversy exceeds $25,000.00, exclusive of interest and costs.

## FACTUAL ALLEGATIONS

9.      Plaintiff incorporates as though fully set forth herein the allegations contained in the preceding paragraphs.

10.     Mr. Sankey has served WMU for over a quarter of a century.

2

11.    For the past several years, until his recent demotion as described below, Mr. Sankey has served as the Director of Maintenance Services for Facilities Management.

12.    Mr. Sankey has excelled in any role he has held at WMU.  In fact, throughout Sankey's lengthy career, he consistently exceeded and met expectations during his annual reviews.

13.    Unfortunately, despite Mr. Sankey's stellar employment record and steadfast dedication to the University, WMU began retaliating and discriminating against Mr. Sankey in 2018.  In September 2018, Associate Vice President of Facilities Management Department Peter Strazdas, authorized a Senior Director position for Facilities Management.  Vice President for Business and Finance and Treasurer for the Board of Trustees, Jan Van Der Kley, was also involved in the creation of this position.

14.    The creation of the new Senior Director position appeared to simply re-create or duplicate a position that previously existed and was eliminated in 2009.

15.    In 2009, Mr. Strazdas was promoted from Director of Maintenance/Remodeling Services to the newly created position of Associate Vice President of Facilities Management.  This new position replaced the Director of Physical Plant position, which was eliminated.

16.    The Director of Physical Plant responsibilities included Transportation Services, Landscape Services, Custodial Services, Labor Relations, Power Plant and Maintenance Services, Facilities Management Information Technology, Facilities Management Business Operations, and Recycling.

17.    Thus, the newly created position of Senior Director mirrored/duplicated the eliminated position that allowed Mr. Strazdas to acquire his new title, responsibilities, and compensation.

18.    Mr. Sankey applied for the Senior Director position, highlighting his work

experience to fulfill the major duties for the posting, his professional achievements, promotions, and his university-wide involvement with various leadership positions.

19.     Mr. Strazdas informed Mr. Sankey that he did not meet the minimum requirements for the position as it related to Mr. Sankey's education, despite Mr. Sankey's lengthy career within Facilities Management.

20.     Ultimately, Mr. Strazdas made an announcement via email in November 2018, that Mr. Steven Gilsdorf received the Senior Director position, who did not have the requisite skills and experience needed for this position.

21.     The process of creating the new position and hiring for this new position specifically discriminated against Mr. Sankey on the basis of his race, national origin, and age.

22.     The minimum educational requirements of either a Master's degree or Professional License created for the new position were not remotely necessary or logical considering the stated responsibilities of the position.

23.     There was no legitimate reason why the position would require the candidate to have completed a Master's degree or Professional License as opposed to equivalent work experience.

24.     It is obvious these minimum requirements were written specifically so that Mr. Sankey would be excluded from consideration and not even be afforded an opportunity to interview.

25.     Indeed, there were two other University Senior Director positions – Senior Director of Infrastructure (Job code 010352) Grade J, which did not require a master's degree, and Senior Director Information Technology (Job Code 009440) Grade I, that did not require a master's degree.  Both positions had minimum requirements of a bachelor's degree.  An additional position,

4

Executive Director of University Relations (Job Code 005670), did not require a master's degree, either.

26.     Even further, Mr. Strazdas' Associate Vice President position—the position above the Senior Director—also did not require a master's degree.

27.     There was also no legitimate reason why the Senior Director of Facilities Management position would only require a minimum of five years of experience in a related field.

28.     The Director of Engineering and Mr. Sankey's then position, the Director of Maintenance Services, which fell under the new Senior Director position within the hierarchy of the organizational structure, require eight years of experience, and the Directors of Custodial and Landscaping positions required five years.  It is illogical that the Senior Director position, which is above the Director positions in the organizational hierarchy, would only require equal to, or even significantly less, experience in a related field.

29.     The Senior Director position appeared to be created by Mr. Strazdas and Ms. Van Der Kley specifically for Mr. Gilsdorf, and the application process was only opened to potential candidates as a formality.

30.     With the exception of the fabricated and illogical educational requirement that was completely unrelated to the actual tasks to be performed in the new Senior Director position, Mr. Sankey was inarguably qualified for the Senior Director of Facilities Management position.

31.     His resume and tenure with WMU at the time he applied for the Senior Director position demonstrated a 21-year career at Western Michigan University, which provided experience, leadership opportunities, and cohesive working relationships with other units within Facilities Management and University wide.

32.     Mr. Sankey also consistently received "meets expectations" or "exceeds

5

expectations" on all of his performance evaluations leading up to his application to the Senior Director role.

33.     Mr. Sankey in good faith believed that his race and/or national origin were motivating factors in the University's decision to add fabricated and illogical educational requirements to the new Senior Director position, in a willful and intentional attempt to bar him from the position.  As such, Mr. Sankey, in early 2019, filed a complaint with the Office of Institutional Equity (OIE), complaining of discrimination by Mr. Strazdas.

34.     Then, Mr. Gilsdorf suspended Mr. Sankey, with pay, on May 28, 2019.

35.     It is evident that Jan Van Der Kley and Mr. Strazdas retaliated against Mr. Sankey for filing his OIE complaint, by requiring Mr. Gilsdorf to suspend Mr. Sankey.

36.     This suspension arose from baseless allegations that Mr. Sankey had been in violation of University rules.

37.     Ms. Van Der Kley and Mr. Strazdas had originally requested that Mr. Sankey be terminated from his employment based upon the allegations, in an effort to specifically target Mr. Sankey in retaliation for his filing of the OIE complaint complaining of discrimination.  However, upon information and belief, their request was overridden by the Board of Trustees for the University.

38.     But on June 5, 2019, WMU changed Mr. Sankey's suspension from paid to unpaid for a period of 60 days.

39.     Mr. Sankey properly filed a grievance challenging the suspension.

40.     Although Mr. Sankey never violated WMU's rules, he was forced to challenge the suspension through numerous levels of internal appeals before WMU appropriately overturned the wrongful suspension.

41.     WMU eventually awarded Mr. Sankey his back pay and fringe benefits (sick and retirement) to compensate him for the pay and benefits he missed while wrongly suspended.  WMU also expunged all references to the wrongful suspension from Mr. Sankey's personnel file.

42.     However, because of Mr. Sankey's successful appeal, the hostile, retaliatory, and discriminatory acts by WMU managerial employees and agents have only continued.

43.     Shortly after WMU reversed Mr. Sankey's wrongful suspension, WMU reduced Mr. Sankey's pay grade by two grades, from J to H.

44.     Either Mr. Gilsdorf or Mr. Strazdas had the authority to appeal this reduction in Mr. Sankey's pay grade.  Thus, Mr. Sankey requested that Mr. Gilsdorf appeal the reduction in his pay grade.

45.     Mr. Gilsdorf, however, did not appeal the reduction in Mr. Sankey's pay grade. Upon information and belief, Mr. Strazdas had directed Mr. Gilsdorf not to appeal the reduction.

46.     In or about July 2020, WMU terminated the employment of Mr. Gilsdorf and removed the Senior Director position altogether.

47.     Without this Senior Director position in place, Mr. Sankey was properly in line for Mr. Strazdas' position once Mr. Strazdas retired.  As the Director of Maintenance Services, Mr. Sankey had a clear path to the Associate Vice President position held by Mr. Strazdas.  And, with Mr. Strazdas' retirement approaching in 2022, Mr. Sankey's advancement to the Associate Vice President position was eminent.

48.     However, Mr. Strazdas could not end his campaign of discriminatory and retaliatory practices at WMU without one final attempt to thwart Mr. Sankey from climbing the ranks.  So, Mr. Strazdas and Ms. Van Der Kley continued discriminating and retaliating against Mr. Sankey.

49.     Merely two weeks before Mr. Strazdas announced his retirement, during a meeting between Mr. Sankey, Mr. Strazdas, and Ms. Van Der Kley on January 18, 2022, Mr. Strazdas and Ms. Van Der Kley demoted Mr. Sankey from Director of Maintenance Services to Manager, Physical Assets.

50.     Ms. Van Der Kley informed Mr. Sankey that this new Manager position had been created specifically for him, that Mr. Sankey would be working for the then Director of Engineering, and that the then Director of Engineering, John Seelman, would assume Mr. Sankey's previous role as the Director of Maintenance Services until a replacement could be found.

51.     WMU immediately replaced Mr. Sankey with Mr. Seelman, as "Acting" Director of Maintenance Services.  Mr. Seelman had only been informed of Mr. Sankey's demotion within just a few hours prior to Mr. Sankey's meeting with Ms. Van Der Kley and Mr. Stazdas on January 18, 2022.

52.     During the January 18, 2022 meeting, Ms. Van Der Kley further informed Mr. Sankey that the demotion would be effective immediately, giving Mr. Sankey no opportunity to alert staff or consider his options.

53.     Ms. Van Der Kley also stated to Mr. Sankey during the meeting, that the decision to demote Mr. Sankey had been vetted by WMU's legal counsel, human resources, the Chief of Staff, and President of the University.  However, Mr. Sankey later discovered that the Chief of Staff and President were not at the time informed of the decision.  Thus, it is clear that Ms. Van Der Kley intentionally misrepresented to Mr. Sankey at the meeting who knew about and supported the demotion, to make it seem legitimate.

54.     Ms. Van Der Kley also informed Mr. Sankey that he had to move from his current office as soon as possible to a much smaller, confined office space.

8

55.     Immediately after the meeting, Mr. Strazdas confirmed Mr. Sankey's demotion by sending an email to the entire Facilities Management department. The expediency of this decision and subsequent email to Mr. Sankey's coworkers and staff clearly demonstrate an intent by Mr. Strazdas and Ms. Van Der Kley to humiliate and tarnish Mr. Sankey's professional reputation.

56.     It is clear that this removal of Mr. Sankey from the Director of Maintenance Services role and placement in the newly created Manager of Facility Assets role was a demotion based upon the following facts:

a.  As Director of Maintenance Services, Mr. Sankey had over 125 people directly reporting to him pre-COVID, and more than 65 people directly reporting to him following layoffs due to COVID.  These direct reports Mr. Sankey had in the Director position included professionals specializing in management technical, and skilled traders.  However, as Manager of Facility Assets, Mr. Sankey has zero direct reports.

b.  As Director of Maintenance Services, Mr. Sankey held authority and responsibility over a budget amounting to approximately $10 million, which he had the discretion to apply to numerous, continuous projects of wide-ranging natures.  However, as Manager of Facility Assets, Mr. Sankey has no discretionary authority over any budget, and only has a one-time allowance of approximately $600,000 that is to be applied specifically to one project, which is a temporary third-party assessment project.

c.  Even though the new position of Manager of Facility Assets has the phrase "facility assets" in the name, Mr. Sankey ironically had substantially more oversight over asset management as more oversight for asset management in

the previous position of Director of Maintenance Services, than in the current Manager of Facility Assets position.

d. As Director of Maintenance Services, Mr. Sankey had an office with a window and a separate seating area for meetings.  Upon his demotion to Manager of Facility Assets, Mr. Sankey was immediately ordered to move out of his office, and into a windowless, confined cubicle.

e. By moving Mr. Sankey to the position of Manager of Facility Assets, WMU placed him in a position that was inferior within the organizational structure, to that of his previous position as Director of Maintenance Services.  In fact, Mr. Sankey is entirely omitted from the ranks of those who are considered leaders in the organization following the demotion, as he is now reporting to John Seelman, Director of the Engineering Division.

f. WMU moved Mr. Sankey to the new, demoted role, immediately, instead of allowing him to continue as the Director of Maintenance Services until a replacement could be found.

57.    The position of Manager, Physical Assets was not even posted for people to apply to, like nearly all other positions at WMU.

58.    There was also no legitimate reason that Mr. Sankey could not continue in his role as Director of Maintenance Services until a replacement could be found, before moving him to the Manager position.

59.    Just as the Senior Director position was created as a roadblock to Mr. Sankey's progression toward the Associate Vice President position, so too was his current demoted role of Manager of Facility Assets.

10

60.     The immediate removal of Mr. Sankey from the position, without even having a replacement for the position in place, also foreseeably created the false and defamatory impression among Mr. Sankey's colleagues that he had somehow violated policy or failed in his duties as Director – which could not have been farther from the truth.

61.     WMU then posted Mr. Sankey's former position, Director of Maintenance Services, to its careers' webpage.

62.     It is clear that Mr. Strazdas and Ms. Van Der Kley wanted Mr. Sankey removed from his Director position so that he would not have a clear path to Mr. Strazdas' Associate Vice President position.

63.     It is also clear that WMU has created unnecessary barriers on the basis of Mr. Sankey's race, ethnic origin, and exercise of his protected rights to prevent Mr. Sankey's ascension.

64.     Following the demotion, Mr. Sankey filed a complaint with WMU's Office of Institutional Equity (OIE), asserting that the demotion was discriminatory and retaliatory.

65.     However, even being further apprised of the discriminatory and retaliatory acts of its managerial employees and agents, WMU failed and refused to take any appropriate remedial action.

66.     Mr. Sankey has spent most of his professional life with WMU, and he has never had to endure such anxiety, humiliation, and abuse in the workplace as he has the past few years.

67.     WMU's creation of this new Manager position effectively demoted Mr. Sankey.

68.     WMU's creation of this new Manager also established roadblocks against Mr. Sankey's advancement at the University, to discriminate and retaliate against Mr. Sankey for filing complaints with the OIE.

11

69.     The demotion of Mr. Sankey was unwarranted, discriminatory, and retaliatory, and has tarnished his professional career with WMU.

70.     The collective actions of WMU's employees and agents described above as caused Mr. Sankey to suffer economically and emotionally.   As a result of the discriminatory and retaliatory demotion, Mr. Sankey has suffered humiliation, significant emotional distress, mental anguish as well as disruption of personal life, loss of enjoyment of the ordinary pleasures of living, loss of earning capacity, loss of wages, and other damages known and unknown.

## COUNT I – Retaliation in Violation of 42 U.S.C. § 1981

71.     Plaintiff incorporates as though fully set forth herein the allegations contained in the preceding paragraphs.

72.     Mr. Sankey engaged in protected activity under § 1981 when he filed his complaint of discrimination based upon race in relation to the University's decision to add fabricated and illogical requirements to the Senior Director position, in a willful and intentional attempt to bar him from the position.

73.     WMU's assignment of Mr. Sankey to the position of Manager, Physical Assets constituted a demotion that adversely affected the terms and conditions of his employment.

74.     WMU had both actual and constructive notice that its managerial employees and agents had unlawfully retaliated against Mr. Sankey in assigning him to the position of Manager, Physical Assets.  Despite having notice of the unlawful retaliation, WMU failed and refused to adequately investigate and take prompt remedial measures to address the retaliation.

75.     WMU demoted Mr. Sankey in retaliation for his protected activity, including but not limited to his filing of the previous discrimination complaint based upon race with the Office of Institutional Equity.

76.     WMU also retaliated against Mr. Sankey in violation of § 1981 by, among other things:

    a.  Immediately replacing Mr. Sankey with John Seelman, as "Acting" Director of Maintenance Services;

    b.  Lying to Mr. Sankey that the decision to place him in the position of Manager, Physical Assets had been vetted by the Chief of Staff and President of WMU, in an effort to legitimize the retaliatory demotion, when the Chief of Staff and President had not been informed of the decision; and

    c.  Ordering Mr. Sankey to immediately move out of his office with a window and a separate seating area for meetings, and into a windowless, confined cubicle.

77.     WMU also created unnecessary barriers to impede Mr. Sankey's advancement within the University, in retaliation for his protected activity of filing the previous discrimination complaint with the Office of Institutional Equity.

78.     All of the retaliatory acts described above, separately and cumulatively, constituted adverse employment action establishing a retaliation claim under § 1981.

WHEREFORE, plaintiff respectfully requests this Honorable Court enter a judgment against defendant Western Michigan University, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds him entitled, together with costs, interest, and attorney fees.

### COUNT II – Retaliation In Violation of Title VII of the Civil Rights Act of 1964

79.     Plaintiff incorporates as though fully set forth herein the allegations contained in the preceding paragraphs.

80.     Mr. Sankey engaged in protected activity under Title VII when he filed his

complaint of discrimination based upon race in relation to the University's decision to add fabricated and illogical requirements to the Senior Director position, in a willful and intentional attempt to bar him from the position.

81.     WMU's assignment of Mr. Sankey to the position of Manager, Physical Assets constituted a demotion that adversely affected the terms and condition of his employment.

82.     WMU had both actual and constructive notice that its managerial employees and agents had unlawfully retaliated against Mr. Sankey in assigning him to the position of Manager, Physical Assets.  Despite having notice of the unlawful retaliation, WMU failed and refused to adequately investigate and take prompt remedial measures to address the retaliation.

83.     WMU demoted Mr. Sankey in retaliation for his protected activity, including but not limited to his filing of the previous discrimination complaint based upon race with the Office of Institutional Equity.

84.     WMU also retaliated against Mr. Sankey in violation of Title VII by, among other things:

   a.   Immediately replacing Mr. Sankey with John Seelman, as "Acting" Director of Maintenance Services;

   b.   Lying to Mr. Sankey that the decision to place him in the position of Manager, Physical Assets had been vetted by the Chief of Staff and President of WMU, in an effort to legitimize the retaliatory demotion, when the Chief of Staff and President had not been informed of the decision; and

   c.   Ordering Mr. Sankey to immediately move out of his office with a window and a separate seating area for meetings, and into a windowless, confined cubicle.

85.     WMU also created unnecessary barriers to impede Mr. Sankey's advancement

14

within the University, in retaliation for his protected activity of filing the previous discrimination complaint with the Office of Institutional Equity.

86.    All of the retaliatory acts described above, separately and cumulatively, constituted adverse employment action establishing a retaliation claim under Title VII.

WHEREFORE, plaintiff respectfully requests this Honorable Court enter a judgment against defendant Western Michigan University, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds him entitled, together with costs, interest, and attorney fees.

## COUNT III – Retaliation In Violation of the Michigan Elliott Larsen Civil Rights Act ("ELCRA")

87.    Plaintiff incorporates as though fully set forth herein the allegations contained in the preceding paragraphs.

88.    Mr. Sankey engaged in protected activity as defined under the ELCRA, MCL § 37.2701(a), when he filed his complaint of discrimination based upon race in relation to the University's decision to add fabricated and illogical requirements to the Senior Director position, in a willful and intentional attempt to bar him from the position.

89.    WMU's assignment of Mr. Sankey to the position of Manager, Physical Assets constituted a demotion that adversely affected the terms and conditions of his employment.

90.    WMU had both actual and constructive notice that its managerial employees and agents had unlawfully retaliated against Mr. Sankey in assigning him to the position of Manager, Physical Assets.  Despite having notice of the unlawful retaliation, WMU failed and refused to adequately investigate and take prompt remedial measures to address the retaliation.

91.    WMU demoted Mr. Sankey in retaliation for his protected activity, including but not limited to his filing of the previous discrimination complaint based upon race with the Office

15

of Institutional Equity.

92.    WMU also retaliated against Mr. Sankey in violation of Title VII by, among other things:

    a.    Immediately replacing Mr. Sankey with John Seelman, as "Acting" Director of Maintenance Services;

    b.    Lying to Mr. Sankey that the decision to place him in the position of Manager, Physical Assets had been vetted by the Chief of Staff and President of WMU, in an effort to legitimize the retaliatory demotion, when the Chief of Staff and President had not been informed of the decision; and

    c.    Ordering Mr. Sankey to immediately move out of his office with a window and a separate seating area for meetings, and into a windowless, confined cubicle.

93.    WMU also created unnecessary barriers to impede Mr. Sankey's advancement within the University, in retaliation for his protected activity of filing the previous discrimination complaint based upon race with the Office of Institutional Equity.

94.    Mr. Sankey's protected activity was a significant and motivating factor in WMU's decisions to engage in the adverse employment actions described above.

95.    All of the retaliatory acts described above, separately and cumulatively, constituted adverse employment action establishing a retaliation claim under ELCRA.

WHEREFORE, plaintiff respectfully requests this Honorable Court enter a judgment against defendant Western Michigan University, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds him entitled, together with costs, interest, and attorney fees.

SHRR\5910384v1

Date:  September 6, 2023                    Respectfully Submitted,

                                           By:  */s/ Charissa C. Huang*
                                                  Charissa C. Huang (P75501)
                                                  Kevin J. Cowan (P85674)
                                                  SMITH HAUGHEY RICE & ROEGGE
                                                  Attorneys for Plaintiff
                                                  100 Monroe Center, N.W.
                                                  Grand Rapids, MI 49503
                                                  616-774-8000
                                                  chuang@shrr.com
                                                  kcowan@shrr.com

## JURY DEMAND

NOW COMES plaintiff, by and through his attorneys Smith Haughey Rice & Roegge and hereby makes a demand for trial by jury.

Date:  September 6, 2023                    Respectfully Submitted,

                                           By:  */s/ Charissa C. Huang*
                                                  Charissa C. Huang (P75501)
                                                  Kevin J. Cowan (P85674)
                                                  SMITH HAUGHEY RICE & ROEGGE
                                                  Attorneys for Plaintiff
                                                  100 Monroe Center, N.W.
                                                  Grand Rapids, MI 49503
                                                  616-774-8000
                                                  chuang@shrr.com
                                                  kcowan@shrr.com

SHRR\5910384v1